Thank you. The final matter that we have for today is Kariye et al. v. Alejandro Mayorkas. Ms. Gorski, good morning. Good morning, Your Honors. May it please the Court, Ashley Gorski for plaintiffs. I'd like to reserve eight minutes for rebuttal. Plaintiffs are three ordinary, law-abiding U.S. citizens who are Muslim and who are subject to intrusive and irrelevant questions about their faith when they return home to the U.S. from international travel. Let me stop you there, Counsel. I've been really puzzled by the briefing, by the government, because the government seems to have sort of now put forth another argument, which is a standing question. So I guess, do you assume from their filings, then, that that's the basis? They've indicated that's the basis that they want us to affirm now, correct? Yes, Your Honor. This is a very unusual appeal in that the government has abandoned nearly every argument it made below except for one. How should we treat that abandonment at this stage? At this stage, Your Honor, because plaintiffs have plausibly alleged a discriminatory policy or practice of religious questioning, the Court should treat those arguments as abandoned and remand the case for discovery as the government proposes. I'm sorry. Go ahead. Pardon me. Why is a policy and practice necessary? This is not a Monell case under Section 1983. If you have alleged that there have been repeated actions against your plaintiffs and it's likely that they will continue, why do you—you don't have to prove a policy and practice, I don't think. Am I wrong on that? We agree with you, Your Honor. We have shown a likelihood of recurrence. Twenty border officers have subjected plaintiffs to religious questioning on ten separate occasions at six different ports of entry. So it seems to me that the finding of policy and practice in this case, as opposed to a 1983 case, is irrelevant. We agree that it's irrelevant, but we've also—  We've pled it. We've met it. And so, in some ways, it's academic because we've so clearly, plausibly alleged a discriminatory policy or practice. And the District Court has found standing in this case correct. That is correct. The District Court held that plaintiffs had adequately alleged a discriminatory policy or practice. So you're asking us simply—you're asking—urging us—on the basis on which the government has argued this, you're asking us to affirm the District Court. Well, we're asking for the District Court's judgment to be reversed. The judgment has to be reversed, but the reasoning for the District Court's order would actually stand. I mean, this is so topsy-turvy. We agree. And if it goes—if we do as the government suggests, if we agree that there's—that you've adequately pled this and send this back to the District Court, is the government still free to come back and—and make the substantive arguments on the Establishment Clause, the Free Exercise Clause, RFRA? Or have they now waived all of that? Well, Your Honor, we are no longer pursuing our Establishment Clause claim, but they have waived those arguments. That's a question for another day, the scope of the waiver, how— Well, they've waived them before us. Yes. I just—I don't understand whether they think—whether they're now thinking that they're going to waive them before the District Court. Because they have waived them before you. If the evidence in this case ultimately conforms to the pleadings, they should be bound by those waivers. But the Court doesn't have to reach that question today. I think the Court may simply remand for discovery. All right. If you take a look at the red brief and the footnote on page 25, you would be satisfied if we were to remand? Yes, Your Honor. Thank you. We would be satisfied if you were to remand for discovery. Now, defendants do make a few different arguments about why, in their view, plaintiff's allegations of a discriminatory policy or practice are implausible. First, they rely heavily on the idea that DHS has a written policy stating that it does not discriminate. But this Court has repeatedly held in Hunter, in Redmond, that a government agency can be unreliable for a practice or an unofficial policy that contradicts the formal written policy. In addition, this memo, the McAleden memo, what the government refers to as the DHS memorandum, is not a meaningful anti-discrimination policy. It contains no standards pertaining to discrimination. And that's in sharp contrast to a separate DHS memorandum on the use of race and ethnicity that requires DHS personnel to use race and ethnicity only where they have a compelling government interest and the use is narrowly tailored to that interest. It explicitly applies strict scrutiny. And that's the standard that should apply here, because religion is also a protected class. But this McAleden memo doesn't mention strict scrutiny. It has no standard at all. Not only that, but it's got three exceptions. And exception number three says, unless we think it's necessary for some other reason, which we're not going to anticipate at this point. So it just seems to me that this is an enormous exception, which means that these officers may have thought that they were enforcing some other policy, which you now wish to challenge, under strict scrutiny. That's exactly right, Your Honor. The McAleden memo permits religious questioning under an extraordinarily lax standard that invites discrimination and that shows that it is likely that plaintiffs will be subject to religious questioning in the future. Second, defendants argue that there were other reasons for the questioning, so that plaintiff's 10 incidents should not count toward the policy or practice. For Imam Karie and Mr. Moosley, defendants point to watch list status. But both plaintiffs plausibly allege that they were placed on the watch list in error. And more importantly, the fact that someone is on a watch list does not explain the particular religious questions challenged here. It does not explain questions like, how many times a day do you pray? Do you pray daily? How religious do you consider yourself? And watch list status would certainly explain additional questioning at the border, other questioning focused on unlawful activity, but it doesn't explain the questions challenged here. And for these questions, it is more than plausible that discrimination is a substantial or- The government hasn't admitted even the existence of the watch list, as far as I can tell, but it certainly is denied that these folks were on a watch list, although it's willing to assume that they were, and then take that as an explanation. Let's assume that there is a watch list, and that your clients were on the watch list. Does that change the nature of your suit? Why can't you then challenge and say, well, yeah, but you went way beyond anything that the government should be entitled to do? Yes, and the government acknowledges the existence of the watch list. It does not confirm or deny whether these plaintiffs were on the watch list. But it shouldn't change the nature of these claims, because the questions that are asked of plaintiffs are completely irrelevant to any legitimate purpose, let alone a compelling purpose that CBP might assert. The questions have no bearing on whether plaintiffs are going to provide, whether they are involved in terrorist activity, or whether they could provide evidence of that activity. And then for Mr. Shaw, defendants- I hope you say that, Ms. Gorski, especially in view that yesterday was 9-11. It's not true that all Muslims are terrorists, but all the terrorists on 9-11 were Muslims, and they were a particular kind of Muslim, weren't they? They were Sunni Muslims. They were Wahhabi Muslims. Why aren't religious questions relevant to determine whether the individuals are likely to be extremist Muslim terrorists? Well, the questions asked here, the questions challenged in this lawsuit, are not relevant to the detection of terrorists at the border, because these questions are questions like how many times a day do you pray? Millions of Americans, including millions of Sunni Muslims, pray daily, several times. Doesn't it go to the devotion that the religious person has to his religion? And if the religion itself is a hallmark of violence, doesn't that have some relevance? But I'm quite prepared to say that these questions that I'm asking are totally irrelevant to this appeal, because as far as I'm concerned, this appeal deals only with the issue of the practice, and I think the practice issue is irrelevant. Your Honor, the practice of Islam is not a hallmark of violence, and given that millions of Americans are Muslim, it cannot be the case that the government has free reign to interrogate all Muslim Americans at the border about the depth of their faith. That is an issue which could be played out in a trial court under strict scrutiny, right? Exactly, and Your Honor, too, asked, the way the question was framed was about whether these questions are relevant, but the relevance, the standard that governs here is strict scrutiny. The questions need to be narrowly tailored to the detection of a terrorist threat at the border, and these questions are not. Third, defendants cite no case from any court holding the allegations like plaintiffs are insufficient to survive a motion to dismiss. They rely on three custom and practice cases, Sabra, Trevino, and Christie. In Sabra and Trevino, both involved one plaintiff alleging one relevant incident. In Christie, two plaintiffs pointed to one incident apiece, and they said that they were subject to unique treatment, not a pattern. The allegations here involving plaintiffs' 10 incidents, dozens of complaints to DHS, and four lawsuits brought by more than 20 Muslim Americans concerning more than 40 incidents of religious questioning are very different. And Sabra was the only one of these cases decided at the motion to dismiss stage. It's very unusual for a court to grant a motion to dismiss on policy or practice grounds because it's a fact-intensive question. And then finally, even if the court were to conclude that plaintiffs have not plausibly alleged a discriminatory practice, plaintiffs' claims should still proceed, and that's for two reasons. First, plaintiffs may still seek expungement of the records reflecting the past unlawful questioning. Expungement is a form of relief that does not depend on a showing that the religious questioning is likely to recur, because the harm is the government's retention and dissemination of the records it has already collected. And these defendants are properly named because they control the database in which these records reside, and they're the ones responsible for the policies concerning the maintenance of these records. And then second, plaintiffs' claims under the Religious Freedom Restoration Act and their associational claims don't depend on a showing of discrimination against Muslims. I would just note, finally, that if defendants have reason to believe that a traveler can provide evidence of terrorism or other criminal activity within CDP's mandate, plaintiffs would not object to CDP asking those questions. But what plaintiffs experience when they come back home from international travel is altogether different. Border officers single them out as Muslim and conduct fishing expeditions into their personal religious beliefs. These questions are not narrowly tailored, and I will preserve the remainder of my time for rebuttal. Thank you. Very well. Thank you, counsel. Daniel Aguilar for Secretary Mayorkas and the federal defendants. So I want to focus on the policy pattern or practice claim because that's how the parties litigated this issue in the district court. And you can see that at excerpts of record 30 through 32, the district court's opinion where it's saying the premise for plaintiff's theory of liability here is establishing a pattern of practice. And that's what this has been litigated in. Hold on one second. I guess I want to make sure I understand. Sure. Would it be fair to say then that you have abandoned the basis for the court's affirmance in the first instance? We are not asking this court to affirm the district court's judgment based on the district court's ruling on the merits or argument on appeal. You've abandoned them and you've waived them. Would that be fair? We are not raising them in this court. That is correct, Your Honor. Okay. And so if the court— If you go back, if we send you back to the district court, are you abandoning them there? No, Your Honor. As we've said in footnote 5 in our brief, what we are saying is we're not asking this court to affirm the district court's judgment based on its analysis of the legal standards to the pleadings alone. As we say in footnote 5, as I said, we think that they have not plausibly alleged a policy pattern or practice and we can get into the merits of that. If the court disagrees, we would ask for a remand so that the parties can engage in discovery and eventually move for summary judgment. Fine. But I want to engage on why we don't think that this has been plausibly pled as a pattern or practice claim. So on pages 30 to 32, the district court is analyzing why they think that's important. If you look to the substance of plaintiff's claims, they repeatedly allege that the reason why the agencies and the official capacity defendants are liable is because they have plausibly alleged a pattern or practice or policy. That's in paragraphs 194, 200, 206 to 209, 216, 222, 233. This was their theory of the case and that's why we engaged with them on it, both in the first motion to dismiss and the second motion to dismiss. That was the party's understanding of why this theory of liability. It indicated that three individuals have been stopped ten times over the period of five years. Why isn't that enough to plausibly allege the concern here? And I think that that's exactly why we engaged in the merits of that on the discussion of how Iqbal and Twombly apply to those. When there is an obvious alternative explanation for secondary screening. Okay. So what's the alternative explanation? So for Mr. Shaw, it's his suspicious behavior during the secondary screening, right? As soon as he's selected for secondary screening, he says, I don't want to be searched. When they pick up his notebook, he says, I don't want you to read that. He's then not exactly elaborative about his financial work that's mentioned in the notebook. His religious writing is in there as well when he says, why are you asking me questions about that? It's alleged the CBP officer responds, we're asking because of what you found in the notebook, which you didn't want us to read. He then says, when asked to search his electronic devices, I'd rather not be searched and I'd be willing not to reenter the United States. Those kind of activities during secondary inspection are red lights for the CBP officers to stop and assess the situation and ask, why does this person not want me to inquire further? And it's a reason for asking particular questions about the things that Mr. Shaw did not want those officers to read. For the other two plaintiffs, Imam Karie and Mr. Moosley, plaintiffs allege that they were on government terrorist watch lists. And so that is a reason for the secondary screening. Some of the questions that they were asked during the secondary screening are, I know that plaintiffs allege some other specific questions, but one of them, for example, on paragraph 58, is Imam Karie left for a pilgrimage on the Hajj. And when he returned to the United States, the question was, did you go on pilgrimage? Have you been on the Hajj before? And to the extent that they're challenging that the written policy of DHS is somehow invidious or explicitly permits discrimination, I don't think that's true. That policy is saying, if you're coming into the United States on, for instance, a religious visa for temporary religious work, the officer may have to ask questions about that if you're seeking asylum for political persecution. So the questions here are all legitimate if you get referred to secondary? That is not our argument. I was simply pointing out that some of these particular questions clearly fall within those  Obviously, we take plaintiffs' allegations as they are. We accept them as true for the purposes of motions that is missed. So are these rogue officers? Assuming that the questions are right, are these rogue officers? I think that that's at most what the complaint alleges. It's alleging that two plaintiffs on a terrorist – I'm just asking whether that's the government's position, that these questions were – if – assuming that they were asked, that these are rogue questions issued by rogue officers. Without further context in the complaint and without a discovery at this opportunity yet, I don't have a particular explanation for some of the questions. On that basis, I think at most what the complaint alleges, accepting that all is true without further context or other evidence – And the government would not be willing to defend the officers and the questions that they were asking about religious practices? That gets out ahead of the decisions that I can make standing before the court here. I mean, our argument here is – It does seem to get way out, and that's why this probably just has to go back. And again, we've suggested if you disagree with our plausibility argument, but we think for the reasons explained here, that where essentially we read the allegations as being consistent with their theory of liability, but something more would be needed, as this court explained in, for instance, In re Centuri, Aluminum Company, which is the case that applied the Starr v. Baca case that they applied and explained. So you need additional factual allegations to flesh out the complaint. And I know that they cite the other allegations made – complaints submitted to DHS or other litigation. The other litigation wasn't cited in their complaint, and to the extent that they're saying other people have made similar complaints, I don't think that gets you past the plausibility threshold. Right? If other people had said, I believe that Southwestern Bell and Atlantic Bell are engaged in antitrust violations, that by itself doesn't tend to add to the plausibility of the pleadings in Twombly. I'm happy to answer any other questions that the court has. I don't have any other questions. No other questions? Thank you, counsel. Thank you. Just responding to my friend's last point, this court can, of course, take judicial notice of the four other lawsuits that plaintiffs have referred to in their briefing, and in three of those cases, the plaintiffs stated an equal protection claim. The defendants moved to dismiss, and the district courts found that the plaintiffs had plausibly alleged discrimination. So these are not merely individuals alleging that they were subject to unlawful religious questioning. You know, a court has found that those allegations are plausible. So your friend on the other side, the government argues that Mr. Shaw engaged in suspicious behavior which justified him being referred to secondary because he said he didn't want them to look at his book, and he was willing not to enter the United States. Is that sufficient to undo your arguments about policy or practice? Not at all, Your Honor. The argument about Mr. Shaw seeming suspicious is absolutely a red herring. At the outset of his interaction with border officers, he invoked his rights not to consent to the search. At that point, the officers became suspicious. They started looking through his journal, and then they began asking him a litany of religious questions like, how religious do you consider yourself? How religious do you consider your family members? And when Mr. Shaw asked, why are you asking me these questions, the CBP officer said, we are asking you because of what we found in your journal. So we don't need to speculate about the CBP officer's motives. They were explicit. They were asking him these irrelevant religious questions based on improper assumptions about Islam because of what they found in his journal, which, as we allege, contained innocent notes about his private religious beliefs and practices, which are rooted in peace and nonviolence. And it is incomprehensible that if a Christian traveler had been in secondary inspection, had said, I don't really want to be searched, and was carrying a scriptural journal that contained their private meditations on the life of Jesus, that a CBP officer would then ask them the same litany of religious questions. It wouldn't happen. I immediately imagined, I mean, I looked at those facts, and I immediately imagined of my grandmother going through the airport with her rosary and then having a litany of questions asked about her religious beliefs. It was certainly puzzling. We agree, Your Honor. It's just extraordinarily difficult to imagine border officers asking a Catholic traveler, how often do you pray the rosary? How many times a day do you pray the rosary? But if you had a Presbyterian group in, let's say, Duluth, Minnesota, that had engaged in domestic terrorism, and we had people at the border stopping folks coming in from Manitoba on their way to Duluth, Minnesota, could we ask them if they're Presbyterians? If the inquiry is individualized, if it is narrowly tailored to a compelling government interest. So depending on the facts there, it's... I mean, I appreciate that's just a boilerplate answer. It's just strict scrutiny, but that just means that everything has to be tested. Everything has to be tested. But it would not be irrelevant to ask questions about one's religious practice, and perhaps to ask about one's religious devotion to Presbyterianism, if the government thought that there was some correlation between Presbyterianism and domestic terrorism. Your Honor, we don't think correlation alone would be sufficient. We maintain that there would have to be some kind of specific justification or belief that this particular traveler could provide evidence of a crime. And that is the standard that this Court articulated in the Bercy case, which involved a grand jury witness who was questioned about their First Amendment protected associations, associations with the Black Panthers. And this Court held that the grand jury witness did not need to respond to questions about their protected associations unless those questions had a substantial possibility of revealing evidence of a crime. And that gives a little more concreteness to the strict scrutiny standard in this context,  With respect to the scope of the waiver, in other contexts, this Court has been very clear that a party cannot offer up successively different legal or factual theories that could have been presented in a prior request for review. So something that plaintiffs are concerned about is the possibility of remand, we proceed to discovery, and then at summary judgment, the evidence conforms to the pleadings, and yet the government tries to advance legal arguments that it could have made here that it refused to make here. So in that sense, we think the defendant should be bound by their waiver on remand. If there are no further questions. So if we remand, your position is that they can't raise the other issues that the judge found regarding the questions were permissible. Your Honor, our position is that the legal arguments that they've abandoned here about, for example, what plaintiffs are required to allege to state a free exercise claim, what plaintiffs are required to allege to state a claim under the Religious Freedom Restoration Act, that they can't sing a different song once we're back on remand. They've had an opportunity to say here, plaintiffs have failed to state those claims. They've asked to send it back to, if we go this route, if we disagree with them on standing, they've asked to send it back for a factual determination. That's how I understand it. And I thought, I understood the government to say that it would go to summary judgment. So they can't come back to 12B6. Right. Yes. But once you engage in discovery, they can come back and still defend on the basis of RFRA free exercise clause, equal protection, and so on. It may be a question for another day, but I don't think that the government should be permitted to make legal arguments that it could have made here, where it could have said plaintiffs failed to state a claim, and then back on summary judgment, they have a new or an old legal theory that they've abandoned, and that they try to present to the district court, and then subsequently to this court. Any additional questions? Any additional questions? All right. Thank you, counsel. Thank you very much. Thank you for the arguments by both counsel today. The matter of Mr. Kyrie versus Mayorkas will be submitted. Thank you. And we will be adjourned for the day.  Thank you.
judges: BYBEE, BEA, MENDOZA